UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

                      Plaintiff,                      17-CV-3482 (RJD)

           v.                              **ORAL ARGUMENT**
                                                        **REQUESTED**

GEORGES BRIGUET,

                      Defendant.

------------------------------------------------------------X

**DEFENDANT GEORGES BRIGUET'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTIONS *IN LIMINE***

Robert S. Fink (RF7924)
Juliet L. Fink (JF5097)
Brian P. Ketcham (BK9934)
KOSTELANETZ & FINK, LLP
7 World Trade Center, 34th Floor
New York, NY 10007
Tel: (212) 808-8100
Fax: (212) 808-8108
rfink@kflaw.com
jfink@kflaw.com
bketcham@kflaw.com
*Attorneys for Defendant Georges Briguet*

i

## TABLE OF CONTENTS

A.   The Swiss Bank Account Records Are Inadmissible ............................................................... 1

    *1.   Plaintiff's Attempt to Offer Records Obtained Pursuant to the U.S.-Switzerland Tax*

    *Treaty is Improper Because the Records Cannot Be Used in This Non-Tax Proceeding*........... 1

    *2.   Plaintiff's Proposed Exhibit 5 ("Contacts Log") Is Inadmissible Hearsay and Double*

    *Hearsay or Should Otherwise be Excluded Pursuant to Fed. R. Evid. 401, 402, and/or 403* .... 6

B.   The Jury Should Not Be Barred From Knowing the Penalty At Issue ..................................... 7

C.   Plaintiff's Counsel  Should Not Be Permitted to Ask Mr. Erdheim Leading Questions ........ 9

D.   Conclusion ............................................................................................................................. 13

Defendant Georges Briguet, by and through counsel, respectfully submits this memorandum in opposition to Plaintiff's motions *in limine* which seek: (1) an order that certain foreign bank account records be admissible at trial; (2) an order to preclude the jury from learning the amount of money Plaintiff demands in this case; and (3) an order to allow Plaintiff's counsel to use leading questions to examine an accountant who is expected to testify at trial.

Plaintiff bears the burden of proof in the case and, now faced with scant admissible evidence that Mr. Briguet willfully failed to file a Treasury Department Form TD F 90-22.1 (a Foreign Bank Account Report, colloquially referred to as an "FBAR") with the Treasury Department for the 2008 reporting period, moves *in limine* asking: (i) that it be allowed to ignore clear limitations on the use of documents it obtained using the U.S.-Switzerland Tax Treaty, (ii) that the Court hide the amount Plaintiff has demanded in this case from the jury, and (iii) that Plaintiff be allowed to ask a critical witness leading questions on direct examination.  All of Plaintiff's motions *in limine* should be denied.

### A.  The Swiss Bank Account Records Are Inadmissible

*1.  Plaintiff's Attempt to Offer Records Obtained Pursuant to the U.S.-Switzerland Tax Treaty is Improper Because the Records Cannot Be Used in This Non-Tax Proceeding*

Plaintiff proposes to offer Swiss bank documents at trial that Plaintiff acknowledges it "obtained from UBS pursuant to the U.S.-Switzerland Tax Treaty."  (Plaintiff's Motions *in Limine* at 1.)  Plaintiff fails to acknowledge, however, that the U.S.-Switzerland Tax Treaty[1]

---

[1] For brevity and clarity, this memorandum refers to the CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND THE SWISS CONFEDERATION FOR THE AVOIDANCE OF DOUBLE TAXATION WITH RESPECT TO TAXES ON INCOME, SIGNED AT WASHINGTON, OCTOBER 2, 1996, TOGETHER WITH A PROTOCOL TO THE CONVENTION as the "Tax Treaty" or the "Treaty" and the PROTOCOL AMENDING THE CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND THE SWISS CONFEDERATION FOR THE AVOIDANCE OF DOUBLE TAXATION WITH RESPECT TO TAXES ON INCOME, SIGNED AT WASHINGTON, OCTOBER 2, 1996 as the "2009 Protocol" or the "Protocol."  These documents are attached hereto as Exhibit A and these

1

unquestionably bars the use of treaty information for any purpose other than use in tax cases.[2] But this is not a tax case; this is an FBAR case.  As explained in more detail below, the Tax Treaty and the 2009 Protocol amending the Treaty preclude Plaintiff from using documents obtained thereunder as evidence in a non-tax case such as this.  This should be plain to Plaintiff from the admonition that appears on the very first page of its proposed exhibits, which states:

> This information is furnished under the provisions of an income tax treaty with a foreign government.  Its use and disclosure must be governed by the provisions of that treaty.
>
> The information contained within must be used ***only for income tax cases*** under the terms of the Agreement between the United States of America and the Swiss Confederation.

(*See* Plaintiff's Motions *in Limine*, Attachment B (Proposed Ex. 4 at 1 (USAProd-000011) (emphasis added)); Attachment C.1 (Proposed Ex. 5 at 1 (USAProd-000018) (emphasis added)); Attachment E.1 (Proposed Ex. 7 at 1 (USA-000078) (emphasis added)); Attachment F (Proposed Ex. 8 at 1 (USAProd-000485) (emphasis added)).  In addition, all of the documents at issue are marked "Treaty Information."

The language quoted above from the UBS records emanates from Article 26 of the Tax Treaty (as amended by the 2009 Protocol), which relates to the Treaty's provisions regarding exchanges of information between the United States and Switzerland.  Specifically, Article 26 bars the use of exchanged information in non-tax cases and states that each country "shall

---

(and other treaty documents) may be found at: https://www.irs.gov/businesses/international-businesses/switzerland-tax-treaty-documents (last accessed Mar. 2, 2020).

[2] To be clear, we are not asserting that the Department of Justice did anything wrong in obtaining bank account documents from the Swiss Confederation.  Rather, Mr. Briguet's position is that Plaintiff's offering of those documents at trial is a violation of the Tax Treaty, which clearly limits the use of the documents to tax cases.  Mr. Briguet is asking that the Court not reward a violation of the Treaty by allowing use of the proposed exhibits at issue at trial.  Simply put, the government should not be able to sue a citizen to enforce an FBAR penalty, then improperly use information obtained through the Treaty as evidence to support its claims in the litigation.

exchange such information as may be relevant for carrying out the provisions of this Convention or to the administration or enforcement of the ***domestic laws concerning taxes*** covered by the Convention insofar as the taxation thereunder is not contrary to the Convention." 2009 Protocol at 2 (emphasis added).  The Protocol goes on to make it clear that information obtained pursuant to the Tax Treaty may only be disclosed to "persons or authorities . . . involved in the ***administration, assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to the taxes*** referred to in paragraph 1, or the oversight of such functions." *Id.* at 3 (emphasis added).[3]  The limitation on the use of treaty information is further supported by the Treasury Department's announcement when the 2009 Protocol entered into force, which does not mention FBARs or any other type of foreign account reporting requirements:

> The U.S. Treasury Department today announced the entry into force of tax treaty protocols with Luxembourg and Switzerland.  The protocols bring the existing tax treaties with Luxembourg and Switzerland into closer conformity with current U.S. tax treaty policy to allow for greater tax information exchange that will enhance efforts to *bolster tax compliance and combat tax evasion.*  The protocols with Luxembourg and Switzerland—in addition to protocols with Japan and Spain—are the first updates to U.S. income tax treaties in nearly 10 years.  They were approved by an overwhelming majority in the United States Senate earlier this year.

Treasury Department Press Release: Treasury Welcomes Entry into Force of Tax Protocols with Luxembourg and Switzerland (Sept. 20, 2019) (emphasis added).[4]  Additional support is found in

---

[3] The 2009 Protocol contains an exception to the general provision that information obtained pursuant to the Tax Treaty may only be used in tax cases where "information may be used for … other purposes under the laws of both States and the competent authority of the requested State authorizes such use." 2009 Protocol at 3.  The exception, however, is plainly inapplicable here.  Plaintiff has made no showing that records at issue may be used to enforce a provision under Swiss law that is analogous to FBAR regulations under U.S. law and that the competent authority in Switzerland has authorized the use of the records at issue in this FBAR case.

[4]*Available at*: https://home.treasury.gov/news/press-releases/sm781 (last accessed Mar. 2, 2020).

the "Overview" to the 2009 Protocol, which describes the changes to the Treaty's exchange of information provision:

> The proposed Protocol and related Agreement would replace the existing Convention's tax information exchange provisions with updated rules that are consistent with current U.S. tax treaty practice. The proposed Protocol and related Agreement allow the tax authorities of each country to exchange information relevant to carrying out the provisions of the Convention or the ***domestic tax laws*** of either country, including information that would otherwise be protected by the bank secrecy laws of either country.

2009 Protocol (Overview: Exchange of Information) (emphasis added).

There can be no dispute that an FBAR case is ***not*** a tax case.   Indeed, in papers previously filed with the Court, Plaintiff observed that Title 31 provides for "solely a monetary penalty" for a failure to file an FBAR (*i.e.*, ***not*** any sort of tax).  (Plaintiff's Brief Accompanying Joint Request to Charge (Doc. 30) at 2.)  The nation's tax laws are codified in Title 26, not Title 31, of the U.S. Code.  But Plaintiff complains ***only*** of an alleged willful violation of Title 31. *See* Amended Complaint (preamble) (Plaintiff "brings this action to collect a civil penalty assessed pursuant to 31 U.S.C. § 5321(a)(5)" for an alleged willful violation of "31 U.S.C. ¶ 5314 and its implementing regulations"); *id.* ¶ 16 (FBAR penalty assessed by IRS "in accordance with 31 U.S.C. § 5321(a)(5)"); *id.* ¶ 18 (statutory additions to the FBAR penalty "assessed pursuant to 31 U.S.C. § 3713(e)(2)").  Indeed, Plaintiff was required to bring this action in this Court because the United States ***Tax Court*** lacks jurisdiction to adjudicate disputes arising under Title 31.  *See Williams v. Comm'r*, 131 T.C. 54 (2008).  The court in *Williams* considered a taxpayer petition challenging FBAR penalties imposed by the Internal Revenue Service (IRS) but noted that FBAR penalties are imposed under Title 31, not Title 26, and that "the FBAR penalties provided in Title 31 are ***nowhere*** made subject to the deficiency procedures of Title 26, on which procedures the bulk of this Court's jurisdiction is predicated."  *Id.* at 57 (emphasis added).  Accordingly, the court charged with adjudicating tax disputes involving the federal

4

government held that it had "no jurisdiction to review the [Treasury] Secretary's determination as to petitioner's liability for FBAR penalties." *Id.* at 59.

IRS—the agency that assessed the FBAR penalty at issue—also recognizes that the penalty is neither a tax nor a tax penalty. *See* IRS Chief Counsel Memorandum No. 200603026 (Sept. 1, 2005) ("Because ***the FBAR penalty is not a tax or a tax penalty***, the presumption of correctness with respect to tax assessments would not apply to an FBAR penalty assessment for a willful violation—another reason we believe that the Service will need to meet the higher standard of clear and convincing evidence.") (footnote omitted; emphasis added).  Courts that have addressed the issue have agreed. *See, e.g., Williams* 131 T.C. at 59 (FBAR penalty is not a tax); *United States v. Simonelli*, 614 F. Supp. 2d 241, 245 (D. Conn. 2008) (holding that the FBAR penalty is a penalty, not a tax, that is "imposed pursuant to a ***non-tax law***" (emphasis added)); *Moore v. United States*, No. C13-2063RAJ, 2015 WL 1510007, at *13 (W.D. Wash. Apr. 1, 2015) (noting that the "FBAR is not a tax requirement, it is a requirement that allows the Government to track accounts held abroad."); *United States v. Schwarzbaum*, No. 18-CV-81147, 2019 WL 3997132, at *3 (S.D. Fla. Aug. 23, 2019) (citing 31 U.S.C. § 5321(a)(5)(A) ("the BSA identifies the applicable [FBAR] penalty as a 'civil monetary penalty.'")).

Quite simply: this case is about an FBAR penalty for the 2008 reporting period ***and nothing more***.  Neither Mr. Briguet's tax returns nor any taxes he may have owed with regard to income from foreign accounts are at issue in this case.  Plaintiff acknowledges that it used the Tax Treaty to obtain bank records for use in this FBAR case and the Treaty clearly does not allow the use of records obtained thereunder in non-tax cases.  Accordingly, Plaintiff's motion *in limine* for an order that the UBS bank records are admissible should be denied in its entirely.

2. *Plaintiff's Proposed Exhibit 5 ("Contacts Log") Is Inadmissible Hearsay and Double Hearsay or Should Otherwise be Excluded Pursuant to Fed. R. Evid. 401, 402, and/or 403*

While, for the reasons set forth above, Mr. Briguet submits that *all* of the UBS records are inadmissible, Plaintiff's proposed exhibit 5—which purports to be a "log" of communications with UBS employees and other (mostly unidentified) individuals—should be excluded on the independent basis that the entire document is filled with hearsay and double hearsay. Fed. R. Evid. 801 and Fed. R. Evid. 802. And, in any event, the few coherent portions of the "log" do not indicate any discussions or statements concerning the 2008 FBAR filing requirement; therefore, this document should be excluded pursuant to Fed. R. Evid. 401. Next, while Mr. Briguet does not dispute that other UBS records appear to be business records showing account balances, various investments held in the account, and account activity, the "contact log" is a different type of document altogether. That document purports to capture statements made at various times by various (often unknown) individuals. And while we concede that a custodian of bank records need not have direct knowledge to authenticate typical bank statements that reflect normal account activity, a custodian cannot authenticate a "log" that contains numerous statements purportedly made by a number of different, mostly unidentified individuals over a course of years (here, 2003 – 2008). Here, the "log" is mostly incoherent, highly misleading, unreliable, and should be excluded, as these infirmities undermine any of the "log's" probative value and present a substantial risk of confusion and unfair prejudice under Fed. R. Evid. 403.

Indeed, ***nearly every single*** log entry raises more questions than it answers and will mislead the jury, create confusion and unfairly prejudice Mr. Briguet. To highlight the numerous problems with this document, we have re-created the document as Exhibit B, adding a new column to the right of the "log," noting objections to the statements set forth in each notation.

6

As noted above, even if the "log" was not riddled with hearsay and double hearsay (which it is) and contained coherent and reliable information (which it does not), there does not appear to be a single notation memorializing any discussion or statement about the FBAR filing requirement, which—as Plaintiff has consistently noted throughout this case—is the sole issue for the jury in this case. The "log" therefore has no relevance to the only issue in dispute in this case and should be excluded pursuant to Fed. R. Evid. 401 and Fed. R. Evid. 402.

Even if it were somehow relevant as to the 2008 FBAR requirement (and it is not), the "log" fails to identify a single person at UBS who created, revised, maintained, or updated the document—the bank employees are only identified by anonymous numbers. Moreover, as counsel's questions in the right hand column of Exhibit B make plain, even if it could be determined who created the notations (and it cannot), the "log" notes are completely unreliable and Plaintiff should not be permitted to mislead and confuse the jury by arguing that its interpretation of the notations (made by unknown individuals whom Plaintiff does not intend to call as witnesses at trial) support its theory that Mr. Briguet willfully failed to file a 2008 FBAR. Accordingly, any of the "log's" probative value is heavily outweighed by a substantial risk of unfair prejudice and should be excluded pursuant to Fed. R. Evid. 403.

### B. **The Jury Should Not Be Barred From Knowing the Penalty At Issue**

Plaintiff publically filed the complaint (Doc. 1) and the amended complaint (Doc. 5) in this case. Mr. Briguet answered the amended complaint and demanded a jury trial (Doc. 8). Plaintiff now asks the Court to hide the penalty alleged in the pleadings from the jury. But this case is not sealed. All of the documents filed by both parties are available to anyone in the public file maintained by the Clerk's Office or anyone with a PACER account. Plaintiff publically sued Mr. Briguet for $2,706,177.82 and there is no basis to shield the jurors from the

contents of the public document that triggered the litigation that called them to jury service. Indeed, if Plaintiff's motion *in limine* on this issue is granted, then the Court would have to instruct the jurors that they are forbidden from reviewing a public court file. Moreover, the FBAR penalty that Plaintiff seeks (50% of the value of Mr. Briguet's Swiss account as of the date of the violation) is public information published by the government in the Code of Federal Regulations and Plaintiff intends to seek admission of numerous bank records reflecting the value of the account at issue. Plaintiff's fear that the jury will know the financial stake in this case is puzzling and the Court should decide this issue in favor of transparency and reject Plaintiff's attempt to obfuscate the goal of the action it has filed from the jury.

This is not a criminal case and we are aware of no civil case where jurors were precluded from reviewing the pleadings underlying a plaintiff's claims and/or a defendant's defenses. Indeed, Plaintiff's misguided concern about the potential for jury nullification is based on criminal law concepts and assumes that jurors in this District will be unable to follow the Court's instructions. For example, Plaintiff cites *Shannon v. United States*, 512 U.S. 573 (1994) as support. *Shannon*, however, held that in a criminal case a trial court need not instruct the jury as to the consequences of finding a defendant not guilty by reason of insanity. *Id.* at 575. *Shannon*'s limited holding is irrelevant in this civil FBAR case. If there is anything relevant about *Shannon* here it is that the Supreme Court declined "to depart from 'the almost invariable assumption of the law that jurors follow their instructions.'" *Id.* at 585 (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). *United States v. Wilkerson*, 2017 WL 5616364 (S.D.W. Va. Nov. 21, 2017), another criminal case relied upon by Plaintiff, is also inapposite. The holding in *Wilkerson* was based on the fact that the jury would play no role in sentencing proceedings for a defendant charged with methamphetamine distribution who faced substantial mandatory

minimum terms of imprisonment in the event of a conviction. *Id.* at *11. Plaintiff's citations to civil cases where trials were bifurcated into separate liability and damages phases is equally misguided—this is not a bifurcated proceeding and the jury will not be called upon to determine facts as to damages or quantify an appropriate amount of damages in this case. Plaintiff also professes fear that the jury will be confused if it becomes aware of the relief sought in this lawsuit, (Pl.'s Motions *in Limine* at 12), but fails to explain how a juror's simple knowledge of the amount at issue in this case might be the slightest bit confusing.[5]

In sum: Plaintiff brought a public lawsuit demanding that judgment be entered against Mr. Briguet in the amount of $2,706,177.82. Mr. Briguet exercised his right to have a jury determine the issues in this case. Plaintiff should not now be permitted to hide from its demand. Therefore, its motion *in limine* to bar the jury from knowledge concerning the penalty at issue should be denied.

## C. **Plaintiff's Counsel Should Not Be Permitted to Ask Mr. Erdheim Leading Questions**

Lastly, Plaintiff attempts to lighten its burden at trial by asking that it be allowed to ask Mr. Briguet's former accountant, Kenneth Erdheim, leading questions. This request should be rejected. Mr. Erdheim is a critical witness and, as Plaintiff learned during Mr. Erdheim's deposition, will testify that he himself likely did not know about the 2008 FBAR filing requirement and that few accountants during the relevant time period knew about the

---

[5] Plaintiff also relies on three insurance cases from the District of Colorado. All are distinguishable. The juries in *Casaretto v. GEICO Cas. Co.*, 2017 WL 7693513 (D. Colo. May 26, 2017), *Seidman v. Am. Family Mut. Ins. Co.*, 2016 WL 8201768 (D. Colo. Sept. 13, 2016) and *Toy v. Am. Family Mut. Ins. Co.*, 2014 WL 486173 (D. Colo. Feb. 6, 2014), were tasked with determining amounts of unpaid or delayed insurance benefits and were simply not instructed that under Colorado law those amounts could be doubled (*Casaretto* at *2; *Seidman* at *3) or trebled (*Toy* at *1).

requirement.  (*See, e.g.*, Exhibit C: Deposition of Kenneth Erdheim ("Erdheim Deposition") at 70:11-17 (Mr. Erdheim did not learn about FBAR requirement until sometime after 2008); *id.* at 70:19-25 (Mr. Erdheim first learned about FBAR requirement at a seminar and, before that, "it wasn't even discussed[.]"); *id.* at 74:18-25 (Mr. Erdheim not familiar with DOJ/UBS deferred prosecution agreement).)  While Plaintiff acknowledges that leading questions are generally forbidden during direct examination, it argues that Mr. Erdheim is a "witness identified with an adverse party" and that Plaintiff therefore should be allowed to ask leading questions pursuant to the exception to the general rule found in Fed. R. Evid. 611(c).  However, the Advisory Committee Notes to Fed. R. Evid. 611(c) make plain that "[t]he rule continues the traditional view that the suggestive powers of the leading question are as a general proposition undesirable."  And the Fifth Circuit has explained that:

> [L]eading questions must not be allowed in controverted substantive areas where the jury must weigh evidence and make credibility determinations.  As we are all fully aware, any good trial advocate who is allowed leading questions can both testify for the witness and argue the client's case by the use of leading questions.  This practice must not be allowed.

*Stine v. Marathon Oil Co.*, 976 F.2d 254, 266 (5th Cir. 1992).

Moreover, Plaintiff's Fed. R. Evid. 611(c) argument relies on an incorrect characterization of Mr. Erdheim's relationship with Mr. Briguet.  Mr. Erdheim is not "identified with" Mr. Briguet. He is Mr. Briguet's former accountant; contrary to Plaintiff's claim, they are not (and never have been) friends.  (*See* Erdheim Deposition at 52:11-18 ("We never hung out. Some of my clients I would go to dinner and talk and things like that, and meet them at night or something.  But with him I never had to do that.  I would meet in the restaurant, we would have dinner, and I would leave and go see other clients.")).  Furthermore, Mr. Erdheim has not prepared a tax return for Mr. Briguet in almost a decade.  While it is true that Mr. Erdheim

sometimes dined at Mr. Briguet's restaurant (which has been closed for several years), the

purpose of such meetings was to discuss the restaurant's accounting or Mr. Briguet's taxes.

Oftentimes, Mr. Erdheim personally brought Mr. Briguet his annual income tax return for

signature, knowing that Mr. Briguet would invite him to stay at the restaurant for lunch as a

courtesy, as Mr. Briguet commonly did with vendors, accountants, union representatives,

attorneys, and business associates so that he would be able to keep an eye on his restaurant while

attending to other matters.  It is also true that Mr. Erdheim taught Mr. Briguet's son, Christopher,

how to use QuickBooks accounting software, as Mr. Briguet was grooming his son to take over

management of the restaurant and Mr. Erdheim wanted to ensure that the books and records of

the business were maintained correctly to ensure that the restaurant's tax returns would be

accurate.  These tasks were a part of Mr. Erdheim's job as a professional certified public

accountant.  He did not prepare Mr. Briguet's returns or teach Christopher Briguet about

QuickBooks out of the kindness of his heart or because of a personal friendship; he did these

things because he was paid to do them.

Indeed, Mr. Briguet was one of over 1,000 clients Mr. Erdheim prepared tax returns for

in a typical year.  (*See* Erdheim Deposition at 28:5-7.)  And Mr. Briguet was not the only client

that Mr. Erdheim made house calls for.  (*See id.* at 29:14-20 ("I used to go out and see people at

work or at their home, crazy hours, and it just got to be too much and not efficient.")); *see also*

*id.* at 29:14-20 (Erdheim generally met with every new client personally unless the client mailed

in the relevant information)).  Plaintiff's assertion that Mr. Erdheim signed a sworn statement

after meeting with counsel is irrelevant.  The affidavit at issue was obtained from Mr. Erdheim

years ago for use in another proceeding, long before Plaintiff initiated this litigation.  Indeed, if

Plaintiff's arguments were correct (and they are not), it would mean that every accountant can be

asked leading questions about his or her clients during direct examination at a trial.  We submit that this is not what Fed. R. Evid. 611(c) was intended to permit and, therefore, Plaintiff's motion *in limine* for an order permitting it to ask Mr. Erdheim leading questions on direct should be denied.

Leading questions may sometimes be appropriate on direct examination to "more quickly get the witness over preliminary matters" in order to "expedite the trial." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 611.06[2][b] (2d ed. 2006).  We submit, however, that it would not be appropriate to determine well in advance of a witness's direct testimony whether leading questions as to key elements of a parties' claims or defenses should be permitted.  As one district court observed, "Courts must be careful … not to expand [Rule 611(c)'s] pre-existing categories.  They may thus wait until trial to determine whether the witness will actually demonstrate hostility." *Sec. & Exch. Comm'n v. Goldstone*, 317 F.R.D. 147, 164 (D.N.M. 2016) (citations omitted).  Lastly, this trial is expected to involve only two or three witnesses, reducing any need to expedite the proceedings by allowing leading questions on direct examination.

For the foregoing reasons, Plaintiff's motion to allow direct examination of Mr. Erdheim with leading questions should be denied.  In the alternative, we respectfully request that the Court defer ruling on Plaintiff's request until Mr. Erdheim's testimony at trial.

//

//

//

//

//

12

**D.  <u>Conclusion</u>**

For the reasons set forth above, Plaintiff's Motions *in Limine* should be denied.

Respectfully submitted,

/s/Robert S. Fink_____
Robert S. Fink (RF7924)
Juliet L. Fink (JF5097)
Brian P. Ketcham (BK9934)
KOSTELANETZ & FINK LLP
7 World Trade Center, 34th Floor
New York, New York 10007
(212) 808-8100 (O)
(212) 808-8108 (F)
rfink@kflaw.com
jfink@kflaw.com
bketcham@kflaw.com
*Attorneys for Georges Briguet*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2020, in accordance with Section III.D.1 of the Court's Individual Motion Practices, I sent two hard copies of the attached document and exhibits by Federal Express, with a courtesy copy by email, to:

Arie M. Rubenstein
U.S. Department of Justice
Tax Division
P.O. Box 55
Washington, D.C. 20044
Arie.M.Rubenstein@usdoj.gov

/s/Juliet L. Fink
Juliet L. Fink (JF5097)